**XEROX CORPORATION, Plaintiff,**

v.

**MEDIA SCIENCES, INC., Defendant.**

**No. 1:06–cv–04872–RJH.**

United States District Court,
S.D. New York.

March 17, 2010.

James Gerard McCarney, Howrey LLP, New York, NY, Jennifer L. Dzwonczyk, Jim W. Ko, Joseph P. Lavelle, Howrey Simon Arnold & White LLP, Washington, DC, for Plaintiff.

Anthony P. La Rocco, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Newark, NJ, Hunter David Keeton, James J. Foster, Wolf, Greenfield & Sacks, P.C., Boston, MA, Seung Lee, William N. Hebert, Calvo & Clark, LLP, William H. Hebert, Kirkpatrick & Lockhart Preston Gates Ellis LLP, San Francisco, CA, for Defendant.

### MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge:

This litigation involves solid ink sticks used in plaintiff Xerox Corp.'s phase change color printers. Xerox has asserted a single claim against defendant Media Sciences Inc. ("MSI") for MSI's alleged infringement of patents relating to Xerox's ink sticks and printer feed chutes. MSI manufactures generic ink sticks for Xerox's color printers and sells them in direct competition with Xerox. At issue are four

patents: Xerox alleges infringement of (1) claims 1–5, and 7 of U.S. Patent No. 6,719,-419 ("the '419 patent"); (2) claims 1–6 of U.S. Patent No. 6,761,444 ("the '444 patent"); claims 4, 5, and 8–10 of U.S. Patent No. 6,966,644 ("the '644 patent"), and claims 1–7 of U.S. Patent No. 6,986,570 ("the '570 patent").

## I. BACKGROUND [1]

The patents-in-suit describe elements of solid ink feed systems for phase change [2] printers. This system works much like the mechanism that delivers staples in a common office stapler. Just as staples are laid onto a track where a spring pushes them forward to the actual stapler component, these ink sticks are dropped down onto a track where a spring loaded mechanism pushes them forward to a heated melt plate. (See Fig. 1 attached hereto.) At the surface of the melt plate, the waxy ink melts and falls below into the print system, and the spring continually pushes more ink stick from the rear to replace the spent ink. Unlike a stapler, the ink stick feed system has four different tracks for this operation, one for black ink plus one for each of the three primary colors. This creates a problem that the stapler does not face: the lay user might put the wrong color ink stick into one of the tracks, where it could damage the printer (or at the very least lead to a bizarre printed product). In order to prevent this from happening, the prior art used a shaped slot over each track to lock out ink sticks that did not have the proper shape. (e.g. Loofbourow et al. U.S. Patent No. 6,966,644.) Thus, each track has a plate over it with a shaped cutout that allows for insertion of only those ink sticks that correspond to

that shape, and which are in turn the correct color. The differently shaped cutouts essentially act as key holes which can only be accessed with a correspondingly shaped ink stick—the key. This approach is referred to as "insertion keying" because the shaped slot/lock and shaped stick/key prevent the user from inserting an incorrect stick into the feed channel.

One apparent innovation in Xerox's patents is to further address the mis-loading problem with what can be referred to as "feed channel keying." With feed channel keying, even if the incorrect ink stick makes it into the feed channel, another key element built into the base of that channel blocks the stick from moving along the channel to the melt plate. A simple example of a feed channel key would be a plastic ridge running the length of the feed channel. Only an ink stick with a gap in that spot would be able to ride the channel down to the heating element. This is described in, for example, the '419 patent, titled "Feed Channel Keying For Solid Ink Stick Feed." Feed channel keying can be combined with insertion keying to doubly ensure that only the correct ink sticks make it into the printer, as for example in the '444 patent. (See Fig. 2 attached hereto).

Another apparent innovation in Xerox's patents is to make the perimeter shapes look like "visually recognizable symbols" such as numbers. Thus in one embodiment each track has a plate over it with a shaped cutout that looks like a stretched out number 1, 2, 3, or 4. (See Fig. 3 attached hereto.) The corresponding ink sticks also look like stretched out numbers 1, 2, 3, and 4, and the hope is that with all

---

**1.** The description provided in this section is not intended to be comprehensive or to be a construction of any disputed claim terms. Rather, it is intended to provide background useful to a proper understanding of the discussion to follow.

**2.** The "phase" that is changing is that of the ink: it is melted from solid ink (inserted in stick form) into a liquid that is applied to the paper.

of this guidance the lay user will correctly load his or her printer. This innovation is expressed, for example, in the '570 patent titled "Feed Guidance and Identification for Ink Stick."

Another problem for phase change printers, which is actually common to office staplers as well, is jamming. In the past, ink sticks have sometimes jammed against the sides of the ink feed channels, and overall friction has caused problems in printer operation. Xerox has attempted to address this problem with a guide-rail system whereby the shaped bottom of a feed channel corresponds to the shaped bottom of the ink stick in a way that guides it along the channel and to the heat plate. Aspects of this approach are expressed in, for example, the '644 patent, titled "Guide For Solid Ink Stick Feed."

MSI makes replacement ink sticks for Xerox printers that compete directly with Xerox's own ink sticks in the printer cartridge after-market. For details on the intricacies of that market, the relationship between MSI and Xerox, and other related issues, see this Court's prior opinions in this case: the September 30, 2009 opinion resolving Xerox's motion for summary judgment on MSI's monopolization counterclaims (660 F.Supp.2d 535); the March 30, 2009 opinion resolving Xerox's motion for partial summary judgment on its first affirmative defense (609 F.Supp.2d 319); and the Sept. 14, 2007 opinion resolving Xerox's motion to dismiss MSI's antitrust counterclaims (511 F.Supp.2d 372). For the purposes of this particular opinion it suffices to know that Xerox sued MSI for patent infringement, the parties requested claim construction, and a claim construction hearing was held on November 6, 2008. This order sets forth the Court's construction of the disputed claim terms.

## II. LEGAL STANDARD

■ The standards governing the construction of patent claims are familiar and well established. *See generally Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir.2005) (summarizing and restating doctrine). Because patents are addressed to practitioners in the field of the patented invention, a court should usually construe claim language consistent with its "ordinary and customary meaning" to a person of ordinary skill in the relevant art on the effective filing date of the patent application. *Id.* at 1312–13. "Such a person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Id.* at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998)).

■ To determine the "ordinary and customary meaning" of a claim term, a court should first consult the intrinsic evidence—the claims, the specification, and the prosecution history. *See, e.g., Primos, Inc. v. Hunter's Specialties, Inc.* 451 F.3d 841, 847–48 (Fed.Cir.2006); *Kinik Co. v. Int'l Trade Comm'n,* 362 F.3d 1359, 1365 (Fed.Cir.2004). Prior art cited to the examiner during prosecution is considered part of the prosecution history. *See Phillips,* 415 F.3d at 1317.

■ "A fundamental rule of claim construction is that terms . . . are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification. . . ." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 347 F.3d 1367, 1370 (Fed.Cir.2003) (citations omitted). Therefore, the patent specification has been called the most important guide to claim construction. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) ("[The

specification] is always highly relevant to the claim construction analysis. Usually, it is dispositive."); *Phillips*, 415 F.3d at 1315–16 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." (quoting *Multiform Desiccants*, 133 F.3d at 1478)).

■ The specification may show that a patentee has provided its own definitions for claim terms or has narrowed the scope of the claims through disclaimer. *See Phillips*, 415 F.3d at 1316. In such cases, the claim is construed according to the patentee's expressed intent even if the resulting construction departs from the ordinary meaning of the claim language. *See, e.g., id.; Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed.Cir.2007) ("When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term."). A patentee may redefine a term either explicitly or implicitly. *See, e.g., Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.Cir.2003) ("The applicant may also act as his own lexicographer and use the specification to implicitly or explicitly supply new meanings for terms"); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir. 2001) ("[T]he specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'").

■■ Though claims should be interpreted in light of the specification, it generally is inappropriate to import limitations from the specification into the claims. *See, e.g., N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed.Cir.2005); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed.Cir.2005); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed.Cir.2001)

(describing the reading of a limitation from the written description into the claims as "one of the cardinal sins of patent law"). For example, the scope of a claim is usually not limited to the particular embodiment or embodiments described in the specification. *See, e.g., Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364–65 (Fed.Cir.2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."). In order to determine whether the limitations of an embodiment should be applied to a claim, a court must determine whether a person of skill in the art would consider the embodiments to be merely exemplary, or whether they are intended to define the scope of the claim. *See Phillips*, 415 F.3d at 1323; *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed.Cir.2006) ("[I]mport[ing] limitations from the specification into the claims ... should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'" (quoting *Phillips*, 415 F.3d at 1323)).

■ The prosecution history, also part of the intrinsic evidence, may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

■ "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics*, 90 F.3d at 1584. While a district court may consult

extrinsic evidence as part of the claim construction analysis, such evidence is considered less reliable than the intrinsic evidence. *See, e.g., Phillips,* 415 F.3d at 1317–19 ("[T]he court should keep in mind the flaws inherent in each type of [extrinsic] evidence and assess that evidence accordingly.").

These guidelines are not exhaustive. As the Federal Circuit has noted, "there is no magic formula or catechism for conducting claim construction," and a court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips,* 415 F.3d at 1324. "[W]hat matters is for the court to attach the appropriate weight ... to those sources in light of the statutes and policies that inform patent law." *Id.*

## III. CLAIM CONSTRUCTION

### A. Scope of Claims

██ The parties dispute whether the claims at issue in this suit cover ink sticks in combination with corresponding key elements, or ink sticks alone. Xerox contends that they are addressed to the ink sticks alone, and MSI asserts that the claimed invention is the combination of an ink stick and its corresponding feed channel or insertion key. Claim 1 of the '419 patent claims "[a]n ink stick for use in a solid ink feed system of a phase change ink jet printer, the ink stick comprising: ..."[3] Claim 1 then features the limitation of an ink stick body

wherein the key element corresponds in shape and position to a feed channel key in a longitudinal feed channel of the solid ink feed system so that the ink stick key element passes the feed chan-

nel key after the ink stick has been at least partially inserted into the longitudinal feed channel.

Xerox contends that because the preamble leads with "an ink stick ... the ink stick comprising," and because other claims in the patents more directly address the entire feed system, the claims should be construed to cover only ink sticks with the described features. MSI argues that the combination forms the claimed invention.

The law governing this specific kind of claim dispute—whether a claim covers a leading element alone or the combination of that apparatus with a described cooperative element—is murky. Xerox points to *In re Stencel,* 828 F.2d 751 (Fed.Cir.1987), as subsequently read by the district court in *Smith Corona Corp. v. Pelikan,* 784 F.Supp. 452 (M.D.Tenn.1992), for the proposition that "an applicant may define and limit an invention in terms of that invention's intended environment without claiming the environment as part of a combination with the invention." *Smith Corona,* 784 F.Supp. at 463, *aff'd,* 1 F.3d 1252, 1993 WL 192516 (C.A.Fed.1993). In *Stencel* itself, an applicant appealed from the USPTO's rejection of his claim for a special driver that could lock a particular collar into position. The driver needed to have a very specific shape in order to initiate the locking mechanism in the collar, and that shape was described in the patent for the driver with reference to the shape of the collar. The USPTO had rejected the claim, stating that although the collar and its locking mechanism were novel, the driver itself was predicted by the prior art: the locking mechanism did not distinguish the driver itself but only the collar that housed it. *Stencel,* 828 F.2d at 754. The Federal Circuit rejected this argument, and held that "[a]s a matter of

---

**3.** The parties treat claim 1 of the '419 patent as representative on this issue, as will the Court. (Pl. Permissible Rep. Opp. 4; Def. Permissible Rep. Rep. 1.)

claim draftsmanship, appellant is not barred from describing the driver in terms of the structure imposed upon it by the collar." *Id.* at 754. Accordingly, the Circuit found that, in light of the included description of the collar, the patent was not predicted by the prior art. *Id.* at 755.

*Stencel* was not a claim construction case, and does not explicitly address the combination claim issue. For additional support, plaintiff relies on *Smith Corona's* interpretation of *Stencel* as quoted above. Indeed *Smith Corona* treated *Stencel* as a claim construction case that was dispositive of the combination claim issue before it. In *Smith Corona*, a typewriter manufacturer had developed a system for matching up ribbon cassettes with the correction cassettes needed for each kind of ribbon. *Smith Corona*, 784 F.Supp. at 457–59. The ribbon cassettes and correction cassettes were connected to each other inside of the typewriter by a hook built into one and a slot in the other that allowed the hook to pass through it. *Id.* Cassettes with matching types of ribbon and correction tape had their hooks and slots located in the same position. *Id.* The parties disputed whether the patent's claims covered the ink ribbon cassette alone or a ribbon cassette in combination with a correction cassette. *Id.* at 460. Based on its interpretation of *Stencel* as permitting an applicant to limit an invention in terms of its intended environment without claiming a combination, the district court in *Smith Corona* concluded that the claims before it were directed only to the ribbon cassette, and not a combination. *Id.* at 463.

The few other cases to have addressed the matter, including most recently *Canon Inc. v. GCC International Limited, GCC,*

450 F.Supp.2d 243 (S.D.N.Y.2006), have applied *Smith Corona's* interpretation of *Stencel*. In *Canon*, a generic manufacturer of ink cartridges for Canon's printers was accused of patent infringement. *Id.* at 246. The printer cartridges at issue connected to the printer itself in part via "a projection" that engaged with "twisted surfaces" on a hole in the printer's driver apparatus. *Id.* at 248–249. The parties disputed whether the patents covered the cartridge alone or the cartridge in combination with the entire printer, a determination which they believed was relevant to determining if the doctrine of permissible repair applied. *Id.* at 247–248. Relying on *Smith Corona's* analysis of *Stencel,* the district court concluded that the patents covered the cartridge alone. *Id.* at 250 ("I conclude that the reading of *Stencel* in *Smith Corona* is correct and applies to claim construction in this case."). However despite *Canon's* reliance on *Smith Corona* (and despite the Federal Circuit's luke-warm and summary affirmation of *Smith Corona* )[4], this Court concludes that *Smith Corona's* reading of *Stencel* cannot determine the outcome of the claim construction issues before it, for several reasons.

First, the *Canon* court quoted and followed the *Smith Corona* analysis of *Stencel,* only to have that analysis explicitly called into question on appeal. Although the Federal Circuit affirmed the result of *Canon* (granting a preliminary injunction), it explicitly cast doubt on *Canon's* combination claim analysis: "[o]n the present record, there is a reasonably debatable question of whether [the disputed claim] should be construed to cover the cartridge alone or the cartridge as part of a combi-

---

4. "Although we deem the case quite close on its facts, and on the application of the law to the facts, we do not discern reversible error in the district court's decision, which is accord- ingly *affirmed.*" *Smith Corona Corp. v. Pelikan,* 1 F.3d 1252, 1993 WL 192516 (C.A.Fed. 1993) (unpublished disposition) (emphasis in original).

nation. Therefore this Court is not now reaching its final conclusion as to the matter." *Canon Inc. v. GCC International Limited, GCC,* 263 Fed.Appx. 57 (Fed.Cir. 2008) (affirming on alternate grounds). *Canon's* analysis of the combination claim issue is indistinguishable from *Smith Corona's,* and accordingly the Federal Circuit's reservations as to *Canon's* approach apply with equal force to *Smith Corona.* This Court therefore undertakes its analysis independently.

The second reason this Court does not rely on *Smith Corona* is that a recent Federal Circuit opinion, decided shortly before *Canon* and not referenced therein, is inconsistent with it. In *Bicon, Inc. v. The Straumann Company,* 441 F.3d 945 (Fed.Cir.2006), a patent holder appealed from a grant of summary judgment of noninfringement. *Bicon,* 441 F.3d at 946. A disputed claim described a cuff for use in dental prosthesis implantation that separated the gum from the implant to permit healing. *Id.* at 946–949. The cuff worked in cooperation with an abutment attached to the implant. *Id.* In addition to being mentioned in the preamble, the abutment's physical features were referred to throughout the description of the cuff, but the preamble led with the cuff alone, so one party argued that the claimed invention was not the combination of cuff and abutment, but any cuff that had the features described in the claim. *Id.* at 940. The Court noted several problems that resulted from construing the claim to cover only the cuff: First, some described elements would have no role in the claim without the abutment, so those terms would be rendered superfluous. *Id.* Second, certain limitations would have to be read out of the patent entirely because they could not exclude anything: a limitation based on the height of the corresponding abutment would become applicable to any abutment that has height—or in other words to any conceivable abutment. *Id.* at

951. The Federal Circuit therefore concluded that "[d]espite the fact that the claim begins with a reference to the emergence cuff alone, the full text of the claim, read in the context of the entire patent, indicates that the claimed invention is the combination of the emergence cuff and the abutment, operating together in the fashion recited in the claim and described in the specification." *Id.* at 952.

What the juxtaposition of *Stencel* and *Bicon* demonstrate is that sometimes a claim can be predicated upon how a claimed item mates with another item without claiming the combination of the two items, but not always. Thus in some circumstances, such as that in *Stencel,* a cooperative element can be a necessary and limiting part of the description without requiring a combination claim. In other circumstances, such as that in *Bicon,* the claimed invention is the combination of the item and its cooperative element.

The third reason this Court does not rely on *Smith Corona* is that it failed to recognize the foregoing distinction. *Smith Corona* over-read *Stencel* as completely foreclosing the possibility of a combination claim when an associated part is described and limiting: from its holding that, under *Stencel,* an applicant *may* define an invention in terms of its environment without claiming that environment, *Smith Corona* appears to have concluded that a combination claim would *never* result. This Court finds that analysis to have skipped a step.

As to filling in that gap and determining when the inclusion of a cooperative element creates a combination claim, the cases provide only limited guidance. Xerox seeks to distinguish *Bicon* because "[u]nlike the claim drafting of *Bicon* ... Xerox *did not* claim specific physical structure [sic] in the preamble that is inextricably intertwined with the claimed elements of the ink stick." (Pl. Permissible Rep.

Opp. 18 (emphasis in original).) That argument correctly points out that the degree of interrelationship between claimed item and cooperative element could be used to differentiate *Bicon* and *Stencel*. *Stencel* could be understood as dealing with those claims where a description of the intended environment for the operation of an invention is necessary to inform the claim, and *Bicon* with those where the explained relationship is an integral part of the invention or where the elements are 'inextricably' intertwined. Xerox is incorrect, however, when it concludes that the feed channel slot and keyed element are not inextricably intertwined simply because they do not have defined physical characteristics. The lack of defined characteristics here actually supports a finding of interrelationship because the slot and keyed element are defined *only* by their correspondence. The ink sticks and feed channel are given no specific contours except for the requirement that their contours correspond. That congruence between slot and matching key is the heart of the claimed invention, and obviously congruence cannot be achieved in isolation. Given this congruence and applying traditional claim construction principles, as the Court in *Bicon* did, the Court concludes that, properly construed, Xerox's claims cover ink sticks in combination with their feed channel keys or insertion key elements.[5]

The Court first looks to the claim language, which describes the feed channel key as well as the ink stick. The claim is to "[a]n ink stick ... [with a key element that] corresponds in shape and position to a feed channel key ... so that [it] passes the feed channel key ... after [it] has been at least partially inserted into the longitudinal feed channel." ('419 patent, claim 1.) Despite describing both the feed channel key and ink stick, the claim preamble *leads* with "[a]n ink stick for use in a solid ink feed system," so one ordinarily skilled in the art might well find the coverage of the claim ambiguous.

Xerox asks the Court to construe the claims as covering an ink stick alone. However if the Court did so the correspondence limitation would be rendered meaningless. "[C]laims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon*, 441 F.3d at 950 (collecting cases). The patent is limited to those ink sticks with "at least one key element formed in the bottom surface ... wherein the key element corresponds in shape and position to a feed channel key." If the claim covers only the sticks, *any* feed channel key can satisfy that limitation. In that case the patent would cover all ink sticks that have a bottom surface that a feed channel key could possibly correspond to. No matter what the shape of the bottom surface of an ink stick, a feed channel key could always be hypothesized that would correspond in shape and position to it. In fact, it appears that feed channel keys could be constructed to cor-

---

**5.** This traditional claim construction analysis also supports the result reached in *Smith Corona* despite its over-reading of *Stencel*. *Smith Corona* buttressed its conclusion with an extensive review of the patent's prosecution history, which it said supported that there was no combination. When originally filed, the patent in *Smith Corona* contained only combination claims. After the initial application was rejected, Smith Corona filed an amendment to its application in which it claimed each component part in isolation, but with limiting reference to the environment. The *Smith Corona* Court found that in light of this history, a construction of the claims as to the ribbon cassette alone was proper. It did not, however, explain why in light of its reading of *Stencel* (which it treated as dispositive) this analysis was necessary. Under this Court's analysis of *Bicon*, as requiring resort to the ordinary principles of claim construction, the prosecution history in the *Smith Corona* case justifies its result and distinguishes it from the patents-in-suit.

respond with the prior art's ink sticks. Thus, Xerox's claim construction would read the correspondence limitation out of the claim altogether.

The prosecution history also supports a combination construction. The ink stick claims in the original '419 patent did not include a limitation based on correspondence to a feed channel key, and those claims were originally rejected because the Loofbourow patent also disclosed a similar keying mechanism. (*See* file history, Ex. E. to Keeton Declaration.) Xerox then amended the ink-stick-led claims to include the limitation based on correspondence to a feed channel key, and the examiner subsequently withdrew those rejections and the patent was approved. The examiner wrote: "It is these limitations found in each of the claims, as they are claimed in the combination that have not been found, taught or suggested by the prior art of record, which makes these claims allowable over the prior art." (Examiner's Comment 61, Ex. E. to Keeton Declaration.) This history, demonstrating that patentability was predicated upon the inclusion of the cooperative element, supports a conclusion that the claim covers a combination.

 Xerox contends that because it drafted the preambles of some claims to lead with ink sticks, and others to lead with feed channels, and yet others to lead with the entire feed system, the ink-stick-led claims do not cover the combination of ink stick and feed channel key. The doctrine of claim differentiation does create a presumption that differently worded claims have different meanings. Yet when they strongly support a different interpretation "the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed.Cir. 2000). Indeed "claims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed.Cir.1998). Moreover, Xerox has not actually shown that under a combination construction the ink-stick-led claims would cover the same subject matter as the feed-system-led claims. In fact, without going so far as to actually construe the combination claims, the former and the latter do not appear to exactly overlap. That is, the Court construes the disputed claims to cover a combination of ink stick and feed channel key or insertion key, not the entire feed system; thus the feed system claims in the patent are not addressed to that combination in particular.[6] Accordingly the Court does not find that claim differentiation overcomes the plain meaning of the claims and their prosecution histories.

Given the wording of the claims as they would be understood by an ordinary person skilled in the art, considering the specification and prosecution history, and espe-

---

6. This distinction may prove relevant to the permissible repair analysis. "Repair is an affirmative defense to a claim of infringement," *Fuji Photo Film Co., Ltd. v. International Trade Com'n*, 474 F.3d 1281, 1293 (Fed.Cir.2007). The Supreme Court has previously held that replacement of a readily replaceable part of a combination patent constitutes repair and not infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 342–343, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). However the Federal Circuit in *Canon* noted its prior precedent that "[a] part is not readily replaceable if the part in question constitutes the bulk of the value of the patented item." *Canon*, 263 Fed. Appx. at 61–62. Because of the value of the printer cartridges in that case as compared to the adjoining element of the printer with which they were patented, the Federal Circuit concluded that "it [was] likely that the replacement of the toner cartridge part of the combination would not constitute a permissible repair." *Id.*

cially in light of the congruence noted above and the problems presented by Xerox's proposed construction, the Court concludes that the correct construction of the disputed claims covers ink sticks in combination with their corresponding feed channel keys or insertion key elements.

### B. Disputed Terms

#### 1. correspond[-s, -ing]

■ The parties request construction of the word "correspond[ ]" as used throughout the patents. Specifically, the parties request construction of its use in the '419 patent claims 1–5, the '444 patent claims 2 and 4, and in the '644 patent claim 4. At the outset, the Court notes the principle that a single claim term should usually be construed to have the same meaning in each claim and across related patents. *See Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed.Cir.2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). In this case, the word "correspond" is used across the claims and related patents in a substantially identical way, the parties treat it as a single term to be construed, and none of the evidence before the Court requires otherwise. Accordingly the Court will give "corresponds" a single construction. As a model use, the '419 patent claims an ink stick wherein:

> the key element *corresponds* in shape and position to a feed channel key in a longitudinal feed channel of the solid ink feed system so that the ink stick key element passes the feed channel key after the ink stick has been at least partially inserted into the longitudinal feed channel. ('419 Claim 4.)

Xerox contends that "corresponds" means "comparable" or "similar." (Joint Claim Chart 3.) Essentially, Xerox argues that the correspondence only serves to allow the key element to pass a feed channel key, and that this can occur even with large spacious keys. Xerox notes that at times the specification refers to correspondence in "shape, size, and position," yet the claim only refers to correspondence in "shape and position," and also concludes therefrom that the size of the key element is not subject to correspondence. Xerox also notes that a number of embodiments involve a slight difference between the shape of the key element in the ink stick and the shape of the corresponding feed channel key: for instance in one embodiment the key element in the ink stick is rounded but the corresponding feed channel key has square edges. From this Xerox concludes that the appropriate construction of "corresponds" is "comparable" or "similar."

Xerox also makes an argument based on claim differentiation of dependent claims 8 and 9 of the '644 patent. Claim 4 of that patent describes insertion keying:

> . . . wherein the insertion perimeter has a perimeter shape corresponding to the shape of an insertion opening through a key plate covering at least a portion of the elongate shaped guide rail.

Claim 8 is dependent upon claim 4 and further limits the stick:

> 8. The ink stick of claim 4, wherein the ink stick insertion perimeter is such that no more than one ink stick having the ink stick insertion perimeter simultaneously fits through the insertion opening

Claim 9 is dependent upon claim 8. The Court finds claim 8 of the '644 patent to be a bit of a non sequitur. In order to satisfy claim differentiation and give meaning to the plain language of claim 8, claim 4's "perimeter shape corresponding to the shape of an insertion opening" would somehow have to allow at least 2 ink sticks to fit through the opening. But only a

nonsense definition of "corresponds" would allow that,[7] and a multi-stick approach is contrary to the specification. The specification describes insertion of a single ink stick many many times, and never references a multi-stick approach. And claim 4 itself requires interaction with a solid ink feed system that includes "*an* elongate shaped guide rail extending in a feed direction." ('644 patent, claim 4 (emphasis added).) The Court has not been asked to construe claims 8 and 9, but finds that a construction of "corresponding" in Claim 4 based on their limitations is inappropriate.

MSI's construction of "corresponds" also focuses on similarity in shape, but requires a somewhat tighter fit than Xerox's "similar": MSI asks the Court to construe "corresponds" as "having substantially the same shape." (Joint Claim Chart 3.) MSI asserts that the ordinary and plain meaning of the term "correspond" is tighter than just having *some* comparison or similarity, and argues that "a square does not correspond to a circle even if one fits within the other." However the dictionary definitions of "corresponds" that MSI cites do not support its "substantial similarity" construction as well as it thinks. As the Court discusses below, "match" and "equivalent," Webster's 3rd New Int'l Dictionary (1993), "relation of congruity," Compact Oxford English Dictionary (3rd ed.2005), and "agree almost exactly," American Heritage Dictionary (4th Ed.2006), describe relationships that go beyond the notion of similarity, to any degree.

The parties argue about the extent to which the claims carry the limitation that the ink sticks cannot pass through non-corresponding keys. They further argue about the extent to which this limitation would support one of their constructions or the other. However incorrect channels could lock out incorrect ink sticks even with a very crude similarity between sticks and their corresponding keys, and they could also fail to do so despite a very close similarity between sticks and their corresponding keys. Simply, the Court is not convinced that this particular limitation would support either parties' construction.[8]

Both parties' constructions, which focus on similarity of shape and differ as to the degree, fail to capture the correct meaning of the term corresponds in this context. The word "corresponds" means more than similar, regardless of degree, because it has an indication of *inter* relationship. Indeed, to say that the slot and key have the "same" shape would be exactly wrong: correspondence here requires inverse shapes that allow one to pass the other. Light bulbs are not shaped like sockets. Rather, part of the ordinary meaning of "corresponds" is a notion of congruence, and that part of the meaning is crucial to the patents-in-suit. That part of the

---

**7.** The Court would have to construe "corresponds" so as to allow ink-stick-perimeters that are less than half that of their "corresponding" key elements. Not only would such definition be contrary to the ordinary meaning of the word corresponds, but it would not support Xerox's preferred construction, which still requires at least some similarity between the shapes.

**8.** MSI makes two other arguments that are inapposite. First, MSI argues that the prosecution history supports its interpretation because the term "corresponds" was added after the initial rejection, but nothing about that addition requires a particular definition of corresponds, and neither the examiner nor the inventor asserted a particular definition at that time. Second, MSI cites *Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558 (Fed.Cir.1990), which also interpreted the word "corresponding," albeit in a patent related to human growth hormone. However there is no requirement that claim terms be interpreted the same across greatly disparate patents. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed.Cir. 2005).

meaning is also consistent with the specification and is reflected in the dictionary definitions of "corresponds" cited by MSI and quoted above. Accordingly, the Court finds that a person with ordinary skill in the art would understand "corresponds" to mean "having a relationship of congruity to," and construes the claims accordingly.[9]

### 2. "non-planar"

■ The parties seem to be in agreement that non-planar, as used in claim 5 of the '644 patent and claims 1, 3, and 5 of the '570 patent, means not in a plane or not flat. There does however seem to be some disagreement as to exactly what it is that the claims require cannot be flat. Xerox contends that it is the entire shaped guide element, and MSI contends that "no portion" of the ink stick guide element can be planar. (*See* Pl. Cl. Const. Resp. 13–15; Def. Cl. Const. Resp. 17–18.)

The claim expressly denotes which elements cannot be flat. Since that is what the parties dispute, the parties are not actually asking the Court to construe "non-planar", but instead are asking for construction of the preceding language in claim 4 of the '570 patent, "*the shaped guide element* is non-planar," and of the surrounding language in claims 1, 3, and 5

of the '570 patent "*a* non-planar *shaped guide element.*" In support of its argument that "[the/a] shaped guide element" means "no portion ·of the ink stick guide element," MSI points out that the specification shows some curved and contoured edges on certain guide elements. But MSI only points to certain preferred embodiments in the specification, and the specification also shows several guide elements that have flat portions. (E.g. '644 fig. 12, 13; '570 fig. 6, 7.) MSI also makes an argument based on the ordinary understanding of "planar," but arguments as to what "non-planar" means do not address what that term describes. The claim is explicit that it is *the* shaped guide element that is non-planar, and no user of English would read "the element" to mean "any portion of the element." (For example, "the red car" would not correctly describe a white car with a red racing stripe.) The Court agrees with Xerox and construes claim 5 of the '644 patent to require that the guide element cannot be solely in a single plane.

### 3. "matches in size and shape"

■ The parties request construction of "matches in size and shape" as used in claims 1 and 3 of the '570 patent.

9. The Court thus interprets each claims as follows:

- '419 Claim 1: "wherein the key element has a relationship of congruity in shape and position to a feed channel key . . . ."
- '419 Claim 2: "the key element has a relationship of congruity in shape and position to a feed channel key that would otherwise prevent the ink stick from being fully inserted into the feed channel."
- '419 Claim 3: "the key element has a relationship of congruity in shape and position to a feed channel key that would otherwise block movement of the ink stick along the longitudinal feed channel."
- '419 Claim 4: "keying means in the ink stick body has a relationship of congruity to the keyed segment of the feed channel."

- '419 Claim 5: "wherein the keying means has a relationship of congruity to a key element . . . "
- '444 Claim 2: "key element having a predetermined shape that has a relationship of congruity to the feed channel key formed in the feed channel."
- '444 Claim 4: "wherein the first keying means comprises a perimeter shape encompassing at least some of the longitudinal surfaces and has a relationship of congruity to a keyed opening in the solid ink feed system."
- '644 Claim 4: "wherein the insertion perimeter has a perimeter shape having a relationship of congruity to the shape of an insertion opening through a key plate covering at least a portion of the elongate shaped guide rail"

. . . wherein the insertion perimeter has at least one perimeter section forming a nonlinear key element that *matches in size and shape* a nonlinear key element in the perimeter of the key plate insertion opening ('570 patent, claims 1, 3)

As Xerox points out, the parties do not disagree as to the construction of this claim. Both say that "matches in size and shape" means "[h]as substantially same shape," although MSI adds " . . . if not exactly the same shape," and Xerox states that "matches in size and shape" should have a different meaning that "corresponds." (Pl. Cl. Const. Resp. 16; Def. Cl. Const. Resp. 19.) Essentially, Xerox attempts to use its request for construction of this claim to further argue for its construction of "corresponds," discussed above.

The Court agrees with the parties that the doctrine of claim differentiation supports giving "matches" a different meaning than "corresponds." So too does the ordinary meaning of matches, which requires a closer association than the word corresponds. The Court construes "matches" consistently with this requirement and with its construction of "corresponds." "Matches" in the '570 patent means "exactly corresponds or has a relationship of exact congruence to."

### 4. "visually recognizable symbol" and "visually identifiable symbol[-s]"

■ Claim 2 of the '570 patent claims "[t]he ink stick of claim 1, wherein the insertion perimeter forms a visually recognizable symbol, and the at least [sic] one perimeter section forms a portion of the visually recognizable symbol." Claim 5 claims a set of ink sticks wherein the ink stick bodies form "visually identifiable symbol[s]" and claim 6 claims a set where "visually identifiable symbols form a pattern of symbols."

The parties ask the Court to construe the terms "visually recognizable symbol" and "visually identifiable symbol[-s]" in these claims. Although the specification explicitly defines the term "visually recognizable symbol," and although both parties agree that it does so, they both manage to argue for different constructions based on that definition. The specification states:

A visually recognizable symbol is a shape that conveys recognizable meaning to a user to help the user identify the opening [opening diagrams listed] through which to insert the ink stick. *The particular ink stick shown has the outer perimeter of the top surface 54 formed in the shape of the numeral "1." As seen, a left segment of the perimeter 57A of the ink stick forms the left portion of the symbol, while a right segment of the ink stick perimeter 57B forms the right portion of the visually recognizable symbol.*

('570 patent, Col. 7, ll. 2–11 (emphases added).)

As the Court reads this language: (1) the first (unemphasized) sentence is the definition of "visually recognizable symbol"; (2) the second (italicized) sentence describes a preferred embodiment, specifically the "top surface" or that preferred embodiment; and (3) the third (underlined) sentence describes a preferred embodiment, specifically the left and right sides of that embodiment. The ink stick described in the second and third sentences is a preferred embodiment because it is introduced with the qualifier "[t]he particular ink stick shown . . . ."

Xerox asks the Court to construe "visually recognizable symbol" as "a shape that conveys recognizable meaning to a user by looking *at the left and right segments* of the ink stick perimeter." (Joint Claim Chart 5 (emphasis added).) This construction is flawed for two reasons. First, it

attempts to read a limitation from a preferred embodiment—that the symbol be formed only in the left and right segments—from the specification into the claim, but this is one of the cardinal sins of claim construction. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1340 (Fed.Cir.2001). Worse yet, Xerox attempts to read in a limitation that is not even in that preferred embodiment, since the preceding sentence describes how the symbol is also formed by the top and bottom surfaces of the ink stick. Moreover, other dependent claims add a sides-only limitation, so claim differentiation further supports leaving that limitation out of the construction. The Court declines to adopt Xerox's proposed construction.

■■■ MSI's proposed construction is the first sentence of the passage quoted above, with some examples appended: "a shape that conveys recognizable meaning to a user to help the user identify the opening through which to insert the ink stick; *for example, alphanumeric characters, the suit shapes from playing cards, or the shapes of animals.*" (Joint Claim Chart 5 (emphasis added).) While MSI's examples are representative of some possible sets of recognizable shapes, they are not listed in the patent's specification as part of the definition of "visually recognizable symbol." Yet "when a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 493 F.3d 1358, 1361 (Fed.Cir.2007). Certainly a patentee's definition governs when it is consistent with the ordinary meaning of a term. Accordingly the Court construes "visually recognizable symbol" to mean precisely what the specification says it means: "[a] visually recognizable symbol is a shape that conveys recognizable meaning to a user to help the user

identify the opening through which to insert the ink stick."

"The parties agree that the claim terms 'visually recognizable symbol' and 'visually identifiable symbol' of the '570 patent are interchangeable." (Pl. Cl. Const. Rep. 16 (citing Pl. Cl. Const. 22–23, Def. Cl. Const. 25).) Although the Court is hesitant to give different claim terms the same meaning, on preliminary review it is unable to identify a material difference between the way the two phrases are used in the patent. Accordingly, the Court accepts the parties' positions and also construes "visually identifiable symbol" to mean "a shape that conveys recognizable meaning to a user to help the user identify the opening through which to insert the ink stick."

### 5. Means Plus Function Claims

The parties ask the Court for construction of three claims written in means-plus-function format as allowed by 35 U.S.C. § 112 ¶ 6. The Federal Circuit has stated that this section "permits an applicant to express a claim limitation as a means ... for performing a specified function without claiming the structure that performs the function." *Biomedino, LLC v. Waters Techs. Corp.,* 490 F.3d 946, 948 (Fed.Cir. 2007). However "[t]he applicant must describe in the patent specification some structure which performs the specified function." *Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1042 (Fed.Cir. 1993). Accordingly the Court construes a means plus function clause first by defining the function, and second by determining which structure(s) in the specification perform that function.

#### (a) '419 Patent, Claim 4:

Claim 4 of the '419 patent claims

Keying means formed in a bottom surface of the ink stick body for permitting the ink stick to be at least partially inserted into a keyed feed channel of the

solid ink feed system without engaging a keyed segment of the keyed feed channel, and to pass through the keyed segment of the keyed feed channel only if the keying means in the ink stick body corresponds to the keyed segment of the feed channel.

Xerox's position is that there are two functions for the keying means: (1) permitting the ink stick to be at least partially inserted into a keyed feed channel of the solid ink feed system without engaging a keyed segment of the keyed feed channel; and (2) permitting the ink stick to pass through the keyed segment of the keyed feed channel only if the keying means in the ink stick body corresponds to the keyed segment of the feed channel. Xerox asserts that the corresponding structure for both keying means is numbers 84, 284, or 484 as disclosed in the specification.

■ MSI asserts that this claim is invalid because it is indefinite. Its argument is as follows: (1) the only structure that permits the ink stick to be "at least partially inserted" is the insertion perimeter; (2) the claim limits its structures to those "formed in the bottom surface"; and (3) since the claim has a function that cannot be performed by the only applicable structure, it is invalid as indefinite.

The mistake in MSI's reasoning is that the bottom key elements *can* permit the "ink stick to be at least partially inserted into a keyed feed channel" without engaging the keyed segment of the feed channel. MSI's argument for why bottom key elements cannot permit partial insertion before engagement is based on its comparison of the terms "partial insertion" and "full insertion" as applied to the ink sticks. MSI argues that "key elements on the bottom of the ink stick are positioned to permit or prevent only full insertion." (Def. Cl. Const. Resp. 13.) From that conclusory statement it further concludes that the only structure that permits the ink

stick to be "at least partially inserted" is the insertion perimeter. (*Id.*) But as the ink sticks are described in the specification, the bottom key elements could permit partial insertion, and MSI's assertion otherwise is unfounded. Since the bottom key elements can permit the ink stick to be partially inserted into a keyed feed channel without engaging the keyed segment of the feed channel, MSI's impossibility and invalidity argument fails.

■ The Court agrees with Xerox's proposed construction. The claim explicitly states that the keying means' functions are: (1) permitting the ink stick to be at least partially inserted into a keyed feed channel of the solid ink feed system without engaging a keyed segment of the keyed feed channel, and (2) permitting the ink stick to pass through the keyed segment of the keyed feed channel only if the keying means in the ink stick body corresponds to the keyed segment of the feed channel. As for the structure that performs this function, it is a bottom key element such as structures 84, 284, and 484 in the specification.

### (b) First and Second Keying Means in the '444 Patent, Claim 1

The '444 patent claims:

[a]n ink stick for use in a feed channel of a solid ink feed system . . . the ink stick comprising: an ink stick body;

first keying means formed in the ink stick body for permitting the ink stick to be inserted in a first direction into a feed channel of the solid ink feed system; and

second keying means formed in the ink stick body for permitting the ink stick to move along the feed channel in a second direction, different from the first direction.

The parties request construction of both the first and second keying means. For the first keying means, the parties agree

that the function is "permitting the ink stick to be inserted in a first direction into a feed channel of the solid ink feed system." They disagree however as to the corresponding structure. MSI notes that the specification describes the structure as having a "shape corresponding" to the keyed opening and explains that another use is to "exclude from each ink feed channel ink sticks of all colors except ... [the correct color]." (Def. Cl. Const. 18–19 (quoting '444 patent, Col. 3, ll. 34–37).) From that MSI concludes that the corresponding structure is "an insertion shape having substantially the same shape as the keyed opening into which the ink stick is designed to be inserted." (Joint Claim Chart 4.)

Xerox argues that the corresponding structure is merely an ink stick insertion perimeter (permitting the ink stick to be inserted in a first direction), for three reasons. First, Xerox notes that independent claim 4 adds a limitation of "corresponding to a keyed opening in the solid ink feed system," ('444 patent, claim 4), so claim differentiation supports leaving that limitation out of Claim 1. Second, Xerox notes that the structures MSI points to in the specification are actually aspects of a preferred embodiment, and limitations from a preferred embodiment are not to be read into the claims. Third, Xerox argues that the specification makes clear that the first insertion structure is simply the ink stick perimeter.

Xerox reads the specification correctly. The segments from which MSI quotes are preferred embodiments. (Compare '444 patent fig. 2 and '444 patent figs. 3, 4, 5.) Moreover, the specification shows ink sticks without key elements in their insertion perimeters, and adds: "[t]he ink sticks illustrated in the present description are shown without insertion key elements around the perimeter of the ink stick. However, most implementations are likely to include such insertion key elements

..." ('444 patent, Col. 3, ll. 45–48.) The claim simply asserts the function of "permitting the ink stick to be inserted in a first direction into a feed channel of the solid ink feed system," and the corresponding structure is the ink stick insertion perimeter.

■ The parties also agree as to the function of the "second keying means": permitting the ink stick to move along the feed channel in a second direction, different from the first direction. However as with the first keying means, they disagree as to the structure. MSI argues that the corresponding structure is keying features formed in the ink sticks, which features have *substantially the same shape* as the feed channel keys. Xerox disagrees that the structure needs to have "substantially the same shape," and asserts that the corresponding structures are 84, 184, 284, 384, 484, or 585 in the specification.

The Court generally agrees with Xerox, and finds that the specification describes the structure that performs the second keying means. It states:

> The key element [84] of the ink stick is a longitudinal recess in the ink stick body. The longitudinal recess extends along the length of the ink stick body, or at least that portion of the length that is configured to follow a path that will intersect the key [82] in the feed channel.

('444 patent, Col. 4, ll. 26–30.)

The specification describes the key element without requiring that it have "substantially the same shape" as the feed channel keys. Furthermore, dependent claim 2 adds the limitation of "corresponding to the feed channel key formed in the feed channel" to the structure of claim 1, so claim differentiation also supports leaving MSI's limitation out of the construction of claim 1. Accordingly, the Court finds that the function of the "second keying means" is permitting the ink stick to move

along the feed channel in a second direction, different from the first direction, and further finds that the corresponding structure is a longitudinal recess in the ink stick body that extends along the length of the ink stick body or at least that portion of the length that is configured to follow a path that will intersect the key in the feed channel, such as element [84] as pictured in the specification.

## IV. CONCLUSION

The Court construes the disputed claim terms as set forth in this order.

SO ORDERED.

### Appendix—*Xerox Corp. v. Media Sciences, Inc.*

Figure 1:

Schematic side view of a feed channel and ink stick. The ink stick is about to be dropped into the channel where it would be pushed from right to left into the melt plate. From U.S. Patent No. 5,861,903. Figure and caption intended for demonstrative purposes only.

**Figure 2:**

Ink feed system with insertion keying and feed channel keying elements. The ink stick could be inserted into the uppermost slot where a spring would push it along the track to the lower-left and into the melt plate. The feed channel and melt plate are not visible, but are beneath the plate [26] that has key elements cut into it. The triangular recess on the side of the ink stick will allow it to be inserted into the leftmost slot. The groove in the bottom of the ink stick [84] will similarly allow the ink stick to pass a "feed channel key"—a groove built into the bottom of the feed channel. Image taken from U.S. Patent No. 6,761,444. Figure and caption intended for demonstrative purposes only.

Figure 3:

Top view of ink sticks that are shaped vaguely like numbers. Feed system insertion keys (cut into a plate covering the feed channels) with a congruent shape would also resemble those numbers. From U.S. Patent No. 6,986,570. Figure and caption intended for demonstrative purposes only.